IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RASSOUL "PAUL" SATTERFIELD, | : | CIVIL ACTION |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | NO. 24-484 |
| PHILADELPHIA DISTRICT | : | |
| ATTORNEY'S OFFICE, *et al.*, | : | |
| | : | |
| *Defendants*. | : | |

Perez, J.                                                                                      May 7, 2026

**MEMORANDUM**

This civil rights action arises from Plaintiff Rassoul "Paul" Satterfield's 1985 murder conviction, which was later vacated after he served nearly four decades in prison. Following his release, Plaintiff brought this action asserting malicious prosecution and related constitutional claims. He advances two theories of civil liability: first, that detectives caused his prosecution by omitting exculpatory eyewitness information from the affidavit of probable cause; and second, that the Philadelphia District Attorney's Office ("DAO") maintained a policy or custom of race-based jury selection that tainted his criminal trial.

Two motions are before the Court. The DAO moves for judgment on the pleadings under Rule 12(c). ECF No. 72. Defendant Michael Fenerty, as Administrator of the Estate of Detective William Thomas, moves to dismiss under Rule 12(b)(6). ECF No. 81. Both motions are granted. Count III against the DAO is dismissed with prejudice, and Counts I and IV against Detective Thomas are dismissed with prejudice. Count II was previously dismissed. ECF No. 52. The claims

against Detective Gallo's Estate remain pending and are addressed only as necessary to explain why the allegations against Detective Thomas stand on different footing.

The Court's disposition of the DAO claim should not be mistaken for indifference to the constitutional right at stake. The right to a jury-selection process free from racial discrimination is not a technical rule of trial management; it is central to the promise of equal justice and fundamental fairness. A criminal defendant is entitled to a jury selection process uninfected by racial bias, and the community has an equal stake in ensuring that race does not determine who may participate in the administration of justice. Allegations that prosecutors used peremptory strikes to exclude black jurors—particularly in a case that resulted in a life sentence—are incredibly serious, but the question before the Court is narrower.

This case comes to the Court at the pleading stage, where the question is not the moral seriousness of the allegations, but whether the Amended Complaint states viable claims against these defendants under the governing law. It does not. Count III fails because the DAO is not a proper defendant under 42 U.S.C. § 1983 and because the pleadings do not plausibly establish municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The claims against Detective Thomas fail because the pleadings do not plausibly connect him to the initiation of Plaintiff's prosecution or to the alleged constitutional defect in the warrant process.

## I.    FACTUAL BACKGROUND

The following facts are drawn from the First Amended Complaint and are accepted as true for purposes of the pending motions.

### A.  The Investigation and Arrest Affidavit

William Bryant was shot and killed in Philadelphia in April 1983. Detective William Thomas was assigned as the lead detective. ECF No. 22 ¶¶ 12–14. Two brothers, Grady Freeman and Eric Freeman, reported that they heard gunshots and then saw a man fleeing. *Id.* ¶¶15–16. Grady Freeman described the man as light-skinned, approximately 5'7" or 5'8", with his hair cut "real close." *Id.* ¶ 15. Eric Freeman described the man as approximately 5'9", white, blond-haired, clean-cut, and clear-complexioned, and stated that the man fled in a white car. *Id.* ¶ 16. Such descriptions did not match Mr. Satterfield, who is black, over six-feet tall, and had dark hair and facial hair at the time of the murder. *Id.* ¶ 17. Both Freeman brothers later viewed a photo array that included Plaintiff, and neither identified him as the man they saw. *Id.* ¶¶ 29–30.

Mr. Satterfield became a suspect after Bryant's wife told investigators about a recent dispute between the two men. According to Bryant's wife, Mr. Satterfield had hired Bryant to repair a television, and the encounter ended in an altercation. *Id.* ¶¶ 18–20. Relying on that information, Detective Thomas obtained a warrant to search Plaintiff's home for two possible murder weapons: a .44 caliber firearm and a .38 caliber firearm, corresponding to bullets recovered from Bryant's body. *Id.* ¶¶ 22–23. The search uncovered no evidence connecting Plaintiff to the homicide. *Id.* ¶ 24.

Detective Thomas later learned that Plaintiff had purchased a .44 caliber firearm in 1980. *Id.* ¶ 25. Plaintiff alleges that this discovery changed the direction of the investigation. Once

3

investigators learned that Plaintiff did not own a .38 caliber firearm, references to a .38 caliber weapon disappeared from the investigative record, and the case thereafter focused only on a .44 caliber weapon. *Id*. ¶¶ 26–27. Even so, an evidentiary gap remained: no eyewitness had identified Plaintiff, no physical evidence linked him to the shooting, and, consequently, the investigation stalled. *Id*. ¶ 31.

Nearly a year later, the investigation revived when an individual named Wayne Edwards went to police with a new account. Edwards claimed that Plaintiff had confessed to killing Bryant, including details about the earlier television repair dispute and disposal of the murder weapon. *Id*. ¶¶ 40–41. According to Plaintiff, Edwards fabricated the account after discovering that Plaintiff was romantically involved with Edwards's wife, using information Plaintiff had shared about the police investigation and recasting it as an admission of guilt. *Id*. ¶¶ 33–41.

Detective Floyd Gallo then swore out the affidavit of probable cause for Plaintiff's arrest. The affidavit relied on two pieces of information: Bryant's wife's account of the television repair dispute and Edwards's report of Plaintiff's alleged confession. *Id*. ¶ 47. It did not disclose that the Freeman brothers had described a fleeing man who did not match Plaintiff, that neither brother identified Plaintiff when shown a photo array, or that Eric Freeman reported seeing a white car leave the scene. *Id*. ¶¶ 47–50. Plaintiff was arrested and prosecuted on the strength of that affidavit. *Id*. ¶¶ 43–53.

### B. Jury Selection and the DAO Claim

Count III centers on the composition of the jury that convicted Mr. Satterfield and on broader allegations concerning race-based jury selection practices within the DAO during the 1980s. Mr. Satterfield contends that the prosecutor assigned to his case, Assistant District Attorney Sandy Byrd, exercised eleven of sixteen peremptory strikes against African American prospective jurors, resulting in an all-white jury. ECF No. 22 ¶ 57. The Amended Complaint further references Byrd's jury selection notes and statements reflecting an effort to "avoid young blacks," which Plaintiff identifies as direct evidence of race-conscious jury selection in his own prosecution. *Id*. ¶¶ 54–58.

The allegations are framed against the backdrop of a broader public reckoning over discriminatory jury selection practices in Philadelphia courts during that era. Plaintiff points to proceedings in *Commonwealth v. Hardcastle*, where concerns were raised during post-verdict proceedings about the exclusion of black jurors in Philadelphia homicide prosecutions. *Id*. ¶ 61. Plaintiff relies on those proceedings as evidence that allegations of race-conscious jury selection were not confined to a single prosecutor or a single case but had become visible within the criminal justice system itself.

The Amended Complaint also relies heavily on the "McMahon tape," a jury-selection training video created by former Assistant District Attorney Jack McMahon sometime in 1987 and made public years afterward. *Id*. ¶¶ 60, 62. The tape has since become a widely discussed artifact associated with prosecutorial jury-selection practices in Philadelphia. In it, McMahon instructed prosecutors on the strategic use of peremptory challenges and openly discussed methods for excluding black jurors from criminal juries. Pennsylvania courts later described the tape as

containing "offensive" and "racially biased" commentary concerning jury selection. *See Commonwealth v. Basemore*, 560 Pa. 258, 276–77, 744 A.2d 717 (2000). The tape's release generated substantial litigation and renewed scrutiny of Philadelphia homicide prosecutions from that period.

Plaintiff invokes the McMahon materials not simply as evidence of one prosecutor's conduct, but as proof of what he characterizes as an entrenched office culture within the DAO. Plaintiff further relies on litigation arising from *Basemore*, in which courts examined whether McMahon's use of peremptory strikes violated *Batson v. Kentucky*, 476 U.S. 79 (1986). ECF No. 22 ¶ 62. Plaintiff contends those proceedings corroborate the existence of discriminatory jury-selection practices within the DAO during the same general period as his prosecution.

Plaintiff also cites studies and statistical analyses examining capital prosecutions handled by Philadelphia prosecutors between January 1987 and April 1991. According to those studies, prosecutors disproportionately exercised peremptory strikes against African American prospective jurors in capital cases. *Id*. ¶ 63. Taken together, Plaintiff contends that Byrd's conduct in his own trial, the concerns raised in *Hardcastle*, the McMahon training materials, the subsequent *Basemore* litigation, and the later statistical evidence reveal what the Amended Complaint describes as a "well-established and adjudicated policy and practice of discrimination" within the DAO. *Id*. ¶ 59.

## I.   PROCEDURAL HISTORY

After years of post-conviction litigation, Plaintiff ultimately obtained federal habeas relief in 2022. The habeas court concluded that Plaintiff's Sixth Amendment right to effective assistance of counsel had been violated because trial counsel failed to investigate and present exculpatory

eyewitness testimony from Eric and Grady Freeman—witnesses whose descriptions of the fleeing individual did not match Plaintiff and who failed to identify him in a photo array. The court vacated Plaintiff's conviction and sentence and ordered the Commonwealth either to retry Plaintiff or release him within 180 days. When the Commonwealth did not retry the case, Plaintiff was released after serving approximately thirty-eight years in prison.

Following his release, Plaintiff commenced this civil action under 42 U.S.C. § 1983 and Pennsylvania law against Detective William Thomas, Detective Floyd Gallo, and the DAO. ECF No. 22. The Amended Complaint asserts four counts: (1) a Fourth Amendment malicious prosecution claim under § 1983 against Detectives Thomas and Gallo, based on the alleged omission of exculpatory eyewitness information from the affidavit of probable cause; (2) a Fourteenth Amendment due process claim against Detectives Thomas and Gallo; (3) a § 1983 municipal liability claim against the DAO, alleging that Plaintiff's conviction resulted from a policy or custom of racially discriminatory jury selection; and (4) a Pennsylvania-law malicious prosecution claim against Detectives Thomas and Gallo. *Id.*

Earlier in the case, Detective Gallo's Estate moved to dismiss the Amended Complaint. ECF No. 24. That motion challenged the claims arising from the allegedly deficient affidavit of probable cause, which Gallo—not Thomas—swore out. The Court dismissed Count II, Plaintiff's generalized Fourteenth Amendment due process claim, but allowed the Fourth Amendment malicious prosecution claim and the parallel Pennsylvania malicious prosecution claim to proceed against Gallo's Estate. ECF No. 52. Count III, the separate § 1983 claim against the DAO based on allegedly discriminatory jury-selection practices, was not before the Court in that motion.

The remaining Defendants now seek dismissal through two separate motions. After answering the Amended Complaint and asserting immunity as an affirmative defense, the DAO

moved for judgment on the pleadings under Rule 12(c). ECF Nos. 71, 72. The DAO argues that it is not a proper § 1983 defendant, that it is immune from suit for conduct undertaken in its prosecutorial capacity, and that Plaintiff has not plausibly alleged a policy or custom that caused his injury. Detective Thomas's Estate separately moves under Rule 12(b)(6) to dismiss the claims asserted against Thomas, arguing that the Amended Complaint does not plausibly allege Thomas's personal involvement in the allegedly defective arrest affidavit or in the initiation of Plaintiff's prosecution. ECF No. 81.

## II.   LEGAL STANDARDS

### A.  Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the pleaded facts allow the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Although the Court accepts well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor, it need not accept legal conclusions or unsupported inferences. *Id.* at 678–79; *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. 2016).

### B.  Rule 12(c)

A Rule 12(c) motion for judgment on the pleadings is analyzed under the same standard as a Rule 12(b)(6) motion. *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017). Judgment on the pleadings is appropriate only where the movant clearly establishes that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law. *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019). In resolving a Rule

12(c) motion, the Court may consider the pleadings, documents attached to or integral to the pleadings, matters of public record, and items subject to judicial notice. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

### III.    DISCUSSION

#### A.  The DAO's Motion for Judgment on the Pleadings is Granted.

Count III alleges that the DAO maintained an unconstitutional policy or custom of excluding black jurors and that this policy or custom caused Plaintiff's conviction. ECF No. 22 ¶¶ 54–63, 86–90. The DAO moves for judgment on the pleadings on three related grounds: (1) it is not a suable entity under § 1983; (2) to the extent the claim concerns prosecutorial functions, the DAO acted as an arm of the Commonwealth rather than a municipal policymaker; and (3) even if the DAO were a proper defendant, Plaintiff fails to plead a plausible *Monell* claim. ECF No. 72-1. The Court agrees that each ground independently supports dismissal.

#### 1.  The DAO is not a suable entity under § 1983.

Section 1983 imposes liability on a "person" who, acting under color of state law, deprives another of federal rights. 42 U.S.C. § 1983. Municipalities and local governmental bodies qualify as "persons" subject to suit under § 1983. *Monell*, 436 U.S. at 690. States and state agencies, however, do not. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64, 71 (1989). Separate from the question whether a district attorney acts on behalf of the Commonwealth or the municipality in a given context, courts in this Circuit have repeatedly addressed a threshold issue: whether a Pennsylvania district attorney's office has a legal existence separate from the county or city such that it may be sued in its own name under § 1983.

9

The Third Circuit addressed that issue in *Reitz v. County of Bucks*, explaining that a Pennsylvania district attorney's office "is not an entity for purposes of § 1983 liability." 125 F.3d 139, 148 (3d Cir. 1997). Although *Reitz* primarily concerned municipal liability claims asserted against Bucks County, the court treated the Bucks County District Attorney's Office itself as legally indistinct from the county and therefore not a proper standalone defendant. District courts within this Circuit have repeatedly interpreted Reitz to mean that Pennsylvania district attorney's offices lack an independent corporate or juridical existence and therefore cannot be sued separately under § 1983.

*Allen v. District Attorney's Office of Philadelphia*, for example, dismissed claims against the Philadelphia DAO because "it is clear that the District Attorney's Office 'is not an entity for purposes of § 1983 liability.'" 644 F. Supp. 2d 600, 611 (E.D. Pa. 2009) (quoting *Reitz*, 125 F.3d at 148). The court reasoned that the proper municipal defendant in a *Monell* action is the municipality itself—not one of its internal departments or offices lacking separate legal status. *Id.* Similarly, *Domenech v. City of Philadelphia* held that the Philadelphia District Attorney's Office could not be sued under § 1983 because it was not a distinct legal entity capable of separate liability. No. 06-1325, 2007 WL 172375, at *2 (E.D. Pa. Jan. 18, 2007). Courts have reached the same conclusion with respect to other Pennsylvania district attorney's offices, treating them analogously to police departments or sub-units of local government that lack independent legal existence. *See, e.g., Washington v. Lehigh County District Attorney's Office*, 541 F. Supp. 3d 536, 549 (E.D. Pa. 2021); *Miller v. County of Chester*, No. 23-3992, 2024 WL 219397, at *6 (E.D. Pa. Jan. 19, 2024).

10

More recent decisions have continued to apply *Reitz* in precisely this manner. *Garcia v. City of Philadelphia* dismissed claims against the Philadelphia DAO both because the challenged conduct involved prosecutorial functions and because the DAO itself is not a suable entity under § 1983. No. 24-6316, 2025 WL 2901074, at *6 (E.D. Pa. Oct. 9, 2025). *Garcia* emphasized that even when plaintiffs frame their allegations as *Monell* claims arising from systemic prosecutorial practices, the DAO itself is not a separate juridical body capable of being sued apart from the City or Commonwealth. *Id.*

Plaintiff relies on *Sourovelis v. City of Philadelphia*, 103 F. Supp. 3d 694 (E.D. Pa. 2015), to argue that district attorney liability must be evaluated functionally and on a case-by-case basis. However, *Sourovelis* addressed a different question: whether the District Attorney acted as a municipal policymaker for purposes of *Monell* liability arising from civil forfeiture practices. *See id.* at 710–11. The claims there proceeded against the City and against officials in their official capacities—not against the DAO itself as an independent legal entity. *Id. Sourovelis* therefore does not undermine the consistent line of authority holding that a Pennsylvania district attorney's office lacks separate legal existence for purposes of § 1983 suit.

Accordingly, even assuming that some district attorney conduct may in certain circumstances constitute municipal policymaking under *Monell*, the DAO itself is not a proper standalone defendant under § 1983. Count III therefore fails as a matter of law.

### 2. The challenged conduct concerns prosecutorial functions undertaken on behalf of the Commonwealth.

The DAO is also entitled to judgment because the challenged conduct concerns core prosecutorial functions: jury selection, trial advocacy, and the training or supervision of assistant

11

district attorneys in performing those functions. Under Pennsylvania law, district attorneys conduct criminal prosecutions in the name of the Commonwealth. *See* 16 P.S. § 14302. The Third Circuit has recognized that, when Pennsylvania district attorneys prosecute crimes or otherwise carry out policies established by the Commonwealth, they act as state officials, not municipal officials. *Carter v. City of Philadelphia*, 181 F.3d 339, 352–53 (3d Cir. 1999).

Recent decisions reinforce that distinction. *Harris v. Krasner* affirmed dismissal of claims premised on prosecutorial decisions because the challenged conduct was "intimately associated with the judicial phase of the criminal process." 110 F.4th 92, 101–05 (3d Cir. 2024). *Pownall v. Krasner* applied the functional prosecutorial immunity analysis and recognized that prosecutorial conduct must be evaluated according to the function being performed. No. 23-2049, 2024 WL 4164621, at *3–4 (3d Cir. Sept. 12, 2024). In *Garcia*, the district court dismissed claims against the Philadelphia DAO arising from alleged trial and prosecutorial misconduct because those prosecutorial actions could not support a § 1983 damages claim against the DAO. 2025 WL 2901074, at *6.

Plaintiff is correct that individual prosecutorial immunity and municipal liability are not the same doctrine. Absolute prosecutorial immunity protects individual prosecutors from damages liability for advocative conduct. *Monell*, by contrast, asks whether a municipal policy or custom caused a constitutional violation. The distinction matters, but it does not save Count III. Count III does not challenge an administrative policy collateral to prosecution, such as budgeting, personnel management, or general office administration. It challenges the conduct of prosecutors in selecting a criminal jury and the alleged training, supervision, or tolerance of prosecutors in exercising peremptory strikes. Those acts are part of the prosecutor's courtroom advocacy. They occur in the judicial phase of a criminal case and are inseparable from the prosecution of the Commonwealth's

charges. In that setting, the District Attorney acts for the Commonwealth, not as a municipal policymaker for the City. Plaintiff cannot transform trial-level prosecutorial decisions—and training directed at those decisions—into a municipal policy claim against the DAO.

Accordingly, even assuming the DAO could be sued in some circumstances, the particular conduct alleged here does not supply a basis for municipal liability under § 1983.

### 3. Plaintiff fails to plausibly plead a *Monell* policy or custom that caused his injury.

Even if the Court assumes, for purposes of analysis, that the DAO is a suable municipal actor, Count III still fails on the merits. A plaintiff seeking to impose municipal liability under § 1983 must identify a policy or custom that caused the constitutional injury. *Monell*, 436 U.S. at 694. A policy is made when a decisionmaker possessing final authority issues an official proclamation, policy, or edict. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). A custom may exist when a practice, though not formally approved, is so widespread and well-settled that it has the force of law. *Id.* The plaintiff must also plead causation by demonstrating an affirmative link between the policy or custom and the particular constitutional violation. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997); *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019).

The Supreme Court has repeatedly emphasized that *Monell* liability is intentionally narrow and cannot rest on respondeat superior liability. Municipalities are not vicariously liable under 42 U.S.C. § 1983 for the acts of individual employees solely because those employees acted under color of law. *Monell*, 436 U.S. at 691. Liability attaches only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where constitutional injuries result

13

from governmental "custom." *Id*. at 690–91. The municipality itself must be the "moving force" behind the constitutional violation. *Brown*, 520 U.S. at 404; *see also City of Canton v. Harris, 489 U.S. 378, 385 (1989)* ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by municipal policymakers.); *Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("[L]ocal governments are responsible only for their own illegal acts.") (cleaned up)).

The Supreme Court refined that principle in *Board of County Commissioners of Bryan County v. Brown,* cautioning that courts must apply "rigorous standards of culpability and causation" before imposing municipal liability. 520 U.S. at 405. A plaintiff cannot establish *Monell* liability merely by identifying conduct that is unconstitutional in hindsight or by pointing to isolated wrongdoing by a single employee. Rather, the plaintiff must plausibly show both that policymakers were deliberately responsible for the challenged practice and that the policy or custom directly caused the particular constitutional injury at issue. *Id*. at 404–07.

A custom may be inferred when the alleged deficiency is not an isolated mistake, but a recurring and obvious gap in municipal practice that predictably exposes individuals to constitutional harm. In *Natale v. Camden County Correctional Facility*, for example, the Third Circuit recognized that a custom may arise where practices are "so permanent and well settled as to virtually constitute law." 318 F.3d at 584. There, the plaintiff presented evidence of systemic failures in providing insulin to inmates during intake procedures, including the complete absence of a policy addressing urgent medication needs. *Id*. at 584–85. The court concluded that the absence of such procedures itself could constitute actionable municipal policy because the risk of constitutional injury was obvious and recurring. *Id*.

14

A plaintiff must also connect the alleged custom to the specific injury at issue; broad allegations of institutional misconduct are insufficient unless they show that policymakers knew of similar violations and failed to correct them. *Estate of Roman v. City of Newark* explained that a plaintiff must demonstrate an "affirmative link" between the alleged policy or custom and the constitutional violation. 914 F.3d 789, 798 (3d Cir. 2019). There, the plaintiff adequately pleaded such a link by identifying repeated similar incidents, prior reports, consent decrees, and documented failures in supervision and discipline that plausibly connected municipal practices to the unconstitutional stop and arrest at issue. *Id*. at 798–800. The decision illustrates that *Monell* liability requires more than an isolated wrong; it requires factual allegations supporting a reasonable inference that policymakers were aware of a recurring constitutional problem and failed to take corrective action.

A municipality's alleged practices cannot support *Monell* liability based on speculation or hindsight alone; the identified custom must plausibly make the plaintiff's specific constitutional injury reasonably foreseeable. *Bielevicz v. Dubinon* explained that municipal liability requires more than the abstract possibility that institutional practices "may have contributed" to a constitutional violation. 915 F.2d 845, 850–51 (3d Cir. 1990). Rather, prior incidents must be sufficiently similar in time, character, and subject matter to place policymakers on notice of a recurring constitutional problem and to support a reasonable inference that the same custom caused the plaintiff's injury. *Id*. The temporal and factual connection between the alleged custom and the plaintiff's injury matters. Evidence arising years later, involving different actors, or addressing materially different conduct may illustrate broader institutional concerns, but it does not necessarily establish that policymakers were on notice of the precise constitutional risk that allegedly injured the plaintiff at the relevant time.

The need for a concrete causal link is especially important when the asserted custom concerns race discrimination in jury selection. The exclusion of citizens from jury service on account of race "causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *Batson v. Kentucky*, 476 U.S. 79, 87 (1986). A prosecutor's use of race in selecting a criminal jury strikes at the legitimacy of the trial itself. At the same time, *Monell* liability requires more than proof that an individual prosecutor acted improperly in a particular case. Evidence that one prosecutor may have exercised peremptory strikes discriminatorily does not, standing alone, establish an office-wide policy attributable to municipal policymakers or demonstrate that such a policy caused another defendant's conviction.

Pennsylvania courts confronting the later-publicized "McMahon tape" repeatedly recognized that distinction. In *Commonwealth v. Rollins*, the Pennsylvania Supreme Court rejected the argument that the tape itself established discriminatory jury-selection practices in unrelated prosecutions handled by different prosecutors. 558 Pa. 532, 546 n.10, 738 A.2d 435 (1999). *Basemore* drew the same line. There, the Pennsylvania Supreme Court treated the McMahon training video as potentially relevant to whether McMahon himself exercised peremptory strikes discriminatorily in a later homicide prosecution. *Commonwealth v. Basemore*, 560 Pa. 258, 283–85, 744 A.2d 717 (2000). The court did not conclude, however, that the tape established a formal DAO policy binding all prosecutors or demonstrated that every earlier prosecution conducted by a different assistant district attorney was infected by unconstitutional jury-selection practices.

Mr. Satterfield's allegations concerning his own trial are deeply troubling. The Amended Complaint pleads that ADA Byrd used eleven of sixteen peremptory strikes against African American venirepersons, resulting in an all-white jury, and that Byrd expressed an intent to "avoid young blacks." ECF No. 22 ¶¶ 54–58. If true, those allegations describe serious constitutional

16

misconduct touching the core promise of equal justice under law. Count III, however, is not a *Batson* claim asserted against Byrd individually. It is a municipal liability claim asserted against the DAO itself. The operative question therefore is not simply whether Byrd acted with discriminatory intent, but whether the Amended Complaint plausibly connects Byrd's conduct to a DAO policy or custom that was the moving force behind the constitutional injury alleged here.

The Amended Complaint fails to plausibly make that connection. Plaintiff relies heavily on the McMahon video as evidence of a broader DAO culture of discriminatory jury selection. ECF No. 22 ¶ 60. Judicial decisions discussing the tape explain that it was created "sometime in 1987," approximately two years after Plaintiff's 1985 trial. *Basemore*, 560 Pa. at 276. The tape also involved a different prosecutor—former ADA Jack McMahon—not ADA Byrd. Those distinctions matter. Later evidence may sometimes illuminate an earlier practice, but *Monell* requires factual allegations supporting a plausible inference that the challenged policy existed at the time of the plaintiff's injury and caused that injury. The Amended Complaint does not plead facts showing that the McMahon tape memorialized a preexisting DAO policy already in force during Plaintiff's trial, that DAO policymakers knew before 1985 that prosecutors were engaging in race-based jury selection, or that Byrd acted pursuant to office-wide direction rather than his own alleged discriminatory intent. Without those connecting allegations, the McMahon tape remains too attenuated—temporally, factually, and institutionally—to establish municipal liability for Plaintiff's trial.

The remaining materials fare no better. Plaintiff points to comments made during post-verdict proceedings in *Commonwealth v. Hardcastle* as evidence of broader discriminatory practices within Philadelphia homicide prosecutions. ECF No. 22 ¶ 61. The Pennsylvania Supreme Court ultimately concluded, however, that the defendant in *Hardcastle* had not established a prima

17

facie case of improper peremptory challenges. 519 Pa. 236, 244–46, 546 A.2d 1101 (1988). Plaintiff also relies on statistical studies examining capital prosecutions between January 1987 and April 1991. ECF No. 22 ¶ 63. Those studies post-date Plaintiff's trial. Whatever concerns those statistics may raise regarding later prosecutorial practices in Philadelphia, they do not plausibly establish that a DAO policy or custom existed at the time of Plaintiff's 1985 trial or caused the strikes exercised in his case.

The allegations against Byrd therefore remain fundamentally case-specific. They do not plausibly establish that Byrd was implementing an official DAO policy, that a final policymaker directed or ratified the challenged conduct, or that a widespread and well-settled custom caused the jury selection in Plaintiff's trial. Count III rests instead on later developed evidence and generalized assertions of institutional practice that do not supply the affirmative causal link *Monell* requires. Count III is dismissed with prejudice.

### B.  Detective Thomas's Motion to Dismiss Is Granted.

Plaintiff asserts federal and state malicious prosecution claims against Detective Thomas. ECF No. 22, Counts I, IV. Detective Thomas's Estate moves to dismiss on the grounds that Thomas did not draft or swear out the allegedly defective affidavit, that Plaintiff fails to overcome qualified immunity, and that Plaintiff fails to plead a material omission sufficient to undermine probable cause. ECF No. 81. The Court need not reach every argument because the First Amended Complaint fails to plausibly allege that Detective Thomas initiated or meaningfully influenced the criminal proceeding that led to Plaintiff's arrest and prosecution.

18

### 1. The law-of-the-case doctrine does not control the claims against Detective Thomas.

Plaintiff argues that the Court's prior ruling on Detective Gallo's motion to dismiss should govern Detective Thomas's motion because the motions raise similar arguments. The law-of-the-case doctrine does not reach that far. The doctrine promotes consistency within a single litigation by discouraging courts from revisiting issues already decided, but it applies only when the same legal issue was previously resolved, either expressly or by necessary implication. *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 61 (3d Cir. 2023).

This Court's prior ruling concerned Detective Gallo, who was the law enforcement official that actually swore out the affidavit of probable cause. ECF No. 22 ¶ 47; ECF No. 52. Thomas is differently situated. He is alleged to have led the earlier investigation, obtained a search warrant, pursued firearm evidence, and shown Plaintiff's photograph to the Freeman brothers. Those allegations describe Thomas's role in the underlying investigation, but they do not allege that Thomas prepared or swore to the affidavit of probable cause, directed Gallo to omit the Freeman information from the affidavit, provided false information to secure the arrest warrant, or otherwise made the decision to initiate criminal charges against Plaintiff.

The Court's ruling that the claims against Gallo could proceed did not expressly or necessarily decide whether Thomas personally initiated, influenced, or caused Plaintiff's prosecution. The Court evaluates the claims against Thomas on the facts pleaded against him.

### 2. Plaintiff fails to state a Fourth Amendment malicious prosecution claim against Detective Thomas.

To state a Fourth Amendment malicious prosecution claim under § 1983, a plaintiff must plead that: (1) the defendant initiated a criminal proceeding; (2) the proceeding ended in the

19

plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with a seizure. *Halsey v. Pfeiffer*, 750 F.3d 273, 296–97 (3d Cir. 2014). When the defendant is a police officer rather than a prosecutor, the plaintiff must allege facts showing that the officer initiated the proceeding, knowingly provided false information, concealed material information, or otherwise meaningfully influenced the prosecutor's or magistrate's decision. *See Geness v. Cox*, 902 F.3d 344, 354–55 (3d Cir. 2018); *Henderson v. City of Philadelphia*, 853 F. Supp. 2d 514, 518–19 (E.D. Pa. 2012).

The First Amended Complaint does not plausibly allege that Detective Thomas initiated Plaintiff's prosecution. The pleaded timeline separates Thomas's initial investigation from the later charging decision. Thomas allegedly investigated the Freeman statements, obtained a search warrant, learned about Plaintiff's firearm history, and showed the Freeman brothers a photo array in 1983. ECF No. 22 ¶¶ 13–31. The investigation then stalled. *Id*. ¶ 31. Approximately one year later, Wayne Edwards reported an alleged confession, and Detective Gallo swore out the affidavit of probable cause. *Id*. ¶¶ 40–47. Plaintiff does not allege that Thomas drafted the affidavit, signed the affidavit, supplied Gallo with false information for the affidavit, directed Gallo to omit information, or participated in the renewed 1984 charging process.

Plaintiff's theory requires the Court to infer that, because Thomas was the initial lead detective and knew about the Freeman evidence, he must have been responsible for or involved in the later omission of that evidence from Gallo's affidavit. That inference is not supported by factual allegations. Rule 12(b)(6) requires the Court to draw reasonable inferences in Plaintiff's favor, but it does not permit the Court to supply essential facts not pleaded. *Iqbal*, 556 U.S. at 678–79. The First Amended Complaint itself attributes the affidavit to Gallo. ECF No. 22 ¶ 47. Without facts

connecting Thomas to the affidavit or to the decision to prosecute, Plaintiff has not pleaded the initiation element of malicious prosecution against Thomas.

Plaintiff also does not plausibly allege that Thomas concealed the Freeman evidence from the actors responsible for the prosecution itself. The First Amended Complaint asserts that the Freeman brothers' descriptions and non-identifications were omitted from the affidavit of probable cause, but it never alleges that Thomas suppressed those witness statements from prosecutors, withheld them from Gallo, or prevented the defense from obtaining them. That omission is consequential because the history of Plaintiff's post-conviction proceedings points in a different direction. Plaintiff obtained habeas relief not because a court found that police concealed the Freeman evidence, but because trial counsel failed to investigate and present the Freeman brothers as defense witnesses. *See Satterfield v. Dist. Attorney Phila*., 872 F.3d 152, 164 & n.5 (3d Cir. 2017); *Satterfield v. Johnson*, 434 F.3d 185, 188 (3d Cir. 2006). The Third Circuit specifically described the ineffective assistance claim as arising from counsel's failure to interview or call witnesses whose existence was known to the defense. Those rulings sit uneasily with the theory advanced here—that Thomas concealed the Freeman evidence so completely that it caused Plaintiff's prosecution and conviction. At a minimum, the Amended Complaint pleads no facts plausibly reconciling those competing narratives.

The causation element fails for the same reason. Plaintiff alleges that the omitted Freeman information was material to probable cause. ECF No. 22 ¶¶ 47–53. Even accepting that premise, however, materiality alone does not establish Thomas's liability. Plaintiff must still plead facts showing that Thomas caused or meaningfully contributed to the omission from the affidavit or otherwise influenced the decision to prosecute. The chronology pleaded in the Amended Complaint does not support that inference. It describes an initial investigation led by Thomas, a

21

case that stalled for nearly a year, a later confession allegation supplied by Edwards, and an affidavit of probable cause ultimately sworn out by Gallo. What is missing is any factual allegation connecting Thomas to the later charging decision or to the preparation of the affidavit itself. The Court cannot bridge that gap through speculation.

The Amended Complaint does not plausibly allege that Thomas initiated the prosecution, concealed material evidence from the relevant decisionmakers, or caused the allegedly unconstitutional prosecution to proceed, so Count I fails as to Detective Thomas.

### 3. Plaintiff fails to state a Pennsylvania malicious prosecution claim against Detective Thomas.

Plaintiff's Pennsylvania malicious prosecution claim fails for many of the same reasons. Under Pennsylvania law, a malicious prosecution plaintiff must plead that the defendant instituted proceedings without probable cause and with malice, and that the proceedings terminated in the plaintiff's favor. *Kelley v. Gen. Teamsters, Local Union 249*, 544 A.2d 940, 941 (Pa. 1988).

Plaintiff has not plausibly alleged that Detective Thomas instituted the criminal proceedings. The First Amended Complaint attributes the arrest affidavit and renewed prosecution to Detective Gallo after Edwards's statement. ECF No. 22 ¶ 47. It does not plead facts showing that Thomas procured, directed, or meaningfully influenced that decision. Nor does it plausibly allege malice by Thomas in the institution of proceedings. Although malice may sometimes be inferred from lack of probable cause, that inference depends on the defendant's role in instituting or procuring the proceedings. Since the First Amended Complaint does not plead that role, Count IV fails as to Detective Thomas.

### C. Dismissal with prejudice is appropriate.

Leave to amend need not be granted where amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Futility exists where the amended pleading would still fail to state a claim upon which relief could be granted. *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir. 2010).

Plaintiff has already amended his pleading. ECF No. 22. The defect as to Detective Thomas is not merely technical or the product of imprecise drafting. The Amended Complaint does not plausibly connect Thomas to the affidavit of probable cause, the renewed charging decision in 1984, or the alleged concealment of the Freeman evidence from prosecutors or defense counsel. The chronology pleaded in the Amended Complaint instead places those events with other actors, most notably Detective Gallo and Wayne Edwards.

Count III against the DAO suffers from more fundamental defects still. The DAO is not a proper defendant under 42 U.S.C. § 1983 for the conduct challenged here, and the *Monell* theory pleaded in the Amended Complaint relies on later developed materials and generalized allegations that remain too attenuated to plausibly establish that a DAO policy or custom caused the jury selection in Plaintiff's trial. Further amendment would therefore be futile. The dismissals are with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the DAO's Motion for Judgment on the Pleadings, ECF No. 72, is granted, and Count III is dismissed with prejudice. Detective Thomas's Motion to Dismiss, ECF No. 81, is also granted, and Counts I and IV are dismissed with prejudice as to Detective Thomas. Count II was previously dismissed by Order dated March 19, 2025. ECF No. 52.